O'NEILL JACOBS, Plaintiff

v.

CLINA JACOBS, Defendant

Civil No. 1974-110

District Court of the Virgin Islands

Div. of St. Thomas and St. John

February 27, 1976

JOHN L. MADURO, ESQ., Charlotte Amalie, St. Thomas, V.I., *for plaintiff*

JAMES L. HYMES, III, ESQ., Charlotte Amalie, St. Thomas, V.I., *for defendant*

YOUNG, *District Judge*

MEMORANDUM OPINION AND DECREE

The case before me for decision presents a classic illustration of the problems which can later arise when an attorney is less than diligent in examining a proposed di-

vorce decree with respect to its potential future implications and ramifications. While the suggested provisions might seem inoffensive at the time they are propounded, this Memorandum Opinion must unfortunately stand as a vivid memorial to the damage which a client may be forced to suffer because of his or her attorney's lack of critical foresight. The most innocent and innocuous terms, seemingly fair and noncontroversial at the time of the termination of the marital relationship, can return to plague an ex-spouse in an entirely different context. It is against just such a possibility that an attorney must remain ever vigilant—scrutinizing each and every provision of a proposed final divorce decree with a critical eye, focusing in upon the likely effects of changes in the existing set of circumstances, searching, examining, and questioning with the lawyerly skills he or she has honed to a fine edge through years of training and experience. Failure to do so can lead to a mess such as the one which I must now attempt to untangle.

On February 17, 1971, Clina Jacobs obtained a final divorce decree from O'Neill Jacobs on the grounds of extreme mental and physical cruelty.[1] At the divorce hearing, Clina was represented by an attorney other than her present counsel. O'Neill did not secure legal representation but instead chose to appear personally. After hearing the testimony of the parties, considering other evidence, and making its Findings of Fact, the Court granted plaintiff a

---

[1] The Findings of Fact in Jacobs v. Jacobs, Civil No. 1970-424, Division of St. Thomas and St. John, provide:

"3. That over the course of their marital life, commencing at an early period thereof, this defendant (O'Neill) has physically assaulted the plaintiff (Clina) to such an extent that continuance of the marriage has become intolerable to the plaintiff, and living in proximity to the defendant has caused and is continuing to cause her to suffer great emotional distress and fear.

"4. That defendant has consistently displayed utter disregard for plaintiff's feelings, by staying out late at night, abusing plaintiff while in drunken rages or otherwise, and by constantly threatening her person. On November 6, 1970, the defendant inflicted a severe beating on the plaintiff with clipping shears, causing her severe injuries and contusions to and over her entire body."

divorce absolute on the grounds of incompatibility of temperament.[2] As part of the Final Decree, the Court ordered and adjudged that the real property previously held by them as Tenants by the Entirety would henceforth, by operation of law, be held as Tenants in Common, "each having an undivided one-half share in the property". The decree also provided that Clina was to have the full and exclusive use, control and possession of the property,[3] but she was to be "solely responsible for the discharge of all existing encumbrances or liens thereon, for all taxes or assessments levied thereon, and for the maintenance and repair of the same . . . ." It must also be observed that the Court further decreed that Clina, having waived alimony, was "therefore forever barred therefrom".

The now apparent inequity of this method of terminating the marital relationship between the parties might have continued unnoticed save for O'Neill's commencement of the instant partition action. Prudence should have dictated his sitting down and keeping quiet. But the age-old adage is that a greedy individual is never satisfied. And so it is to Mr. Jacob's unbounded avarice that credit must be given for exposing this injustice to the light of judicial scrutiny.

The parties married on October 7, 1959. In December of 1964, having decided to purchase a home together for $15,400.00, they jointly took out a real estate loan from the Chase Manhattan Bank in the amount of $14,900.00, giving back a first mortgage as security therefor. Apparently, both parties jointly made the payments on said loan during the pre-divorce years and on the eve of the divorce decree, the outstanding principal balance had been reduced

---

[2] Although the Final Decree expressly states that "incompatibility of temperament" was the grounds, the attached Findings of Fact clearly indicate that the grounds actually were "cruel and inhuman treatment". See footnote #1, supra.

[3] This is the property now in dispute: Parcel No. A-7, Estate Anna's Retreat (Tutu), No. 1 New Quarter, St. Thomas, U.S. Virgin Islands.

to $12,822.94. Simple arithmetical operations lead me to the conclusion that immediately prior to the granting of the divorce decree, O'Neill Jacobs had acquired an equity in the property of $1,288.53. Clina Jacobs' equity was the same. Yet, the divorce decree put the sole obligation upon her to pay off the outstanding indebtedness. Effectively, she was given a life estate in his half of the property in return for paying off his share of the mortgage, assuming his half of the various taxes and assessments, maintaining and repairing his fraction of the premises, and waiving her entitlement to alimony. In other words, assuming Clina Jacobs lived long enough to pay down the mortgage, O'Neill Jacobs would stand to receive upon his ex-wife's death a property interest which conceivably could well exceed $40,000.00[4]—all in return for an investment on his part of $1,288.53.

\*　　\*　　\*

Mr. O'Neill Jacobs filed the instant complaint on February 25, 1974. Therein, he alleged that by the terms of a divorce decree granted over three years earlier, the ownership of the once marital home in Tutu was converted from a Tenancy by the Entirety to a Tenancy in Common, with his ex-wife, Ms. Clina Jacobs, having the exclusive use, control, and possession of the same. Plaintiff O'Neill Jacobs prayed for a partition of the property or, in the alternative, for a judicial sale of the same.

Clina was duly served but failed to secure legal representation. O'Neill, apparently in no rush, acquiesced in not getting court action on his unanswered complaint until December 23, 1974, when he moved for and obtained the appointment of Gladstone Knight as a referee to determine

---

[4] In 1964, the property was worth $15,400.00. Recently, it has been appraised at approximately $40,000.00. Clina Jacobs has a life expectancy of 36.7 years. Assuming the present rate of land value appreciation to remain the same, this property will be worth over $160,000.00 if Clina Jacobs lives out her present life expectancy.

the feasibility of a physical partition and to submit an appraisal in the event that a sale would be ordered. Mr. Knight determined that a physical partition was not feasible and he appraised the market value of the property, as of April 7, 1975, to be $39,560.00.

Clina finally answered on April 17, 1975 by admitting most of O'Neill's allegations save for denying that O'Neill's net equity interest in the property amounted to a one-half share. Additionally, she counterclaimed for an amount equal to O'Neill's proportionate share "of all expenses incurred by her in obtaining, maintaining, preserving the property . . . ." She amended her answer two months later to include an affirmative defense that the final divorce decree granted her only a life estate in her ex-husband's one-half interest which, as a matter of law, could not be affected by a judgment of partition. There matters stood until the hearing held on November 18, 1975.

At the hearing, Clina testified that she not only continued the payments on the mortgage without receiving any assistance from O'Neill, but that she alone paid for the post-divorce additions to the house. She produced receipts for building materials and supplies totaling $345.30 and for labor expenses amounting to $2,137.00. In addition, she introduced into evidence $6,245.62 worth of mortgage payment receipts and $7,090.02 of loan repayment stubs. O'Neill testified that he had paid all of the labor and material bills but had foolishly instructed his payees to make out and give the receipts to his ex-wife. He also offered into evidence some invoices dating back to the pre-divorce years which I consider irrelevant to the determination of the issue herein. Additionally, O'Neill produced some payroll stubs indicating that some $1,223.82 was deducted from his earnings and paid over to a bank.

Both sides have challenged the veracity of the other not only as to who, in fact, made the payments but also as to

whether or not there was any post-divorce communication between the parties. Since their positions are mutually inconsistent, the question of credibility comes to the fore.

██ Chase Manhattan Bank disclosed that its records could not reveal which of the parties had made the payments on the real estate loan during the pre-divorce years. Inasmuch as both Clina and O'Neill each stated that they alone made the payments, I must reluctantly credit each party with one-half of the total payments made. Accordingly, as of the date of the divorce, both Clina and O'Neill had individual equity interests in the property amounting to $1,288.53. However, I find that Clina alone has made all the post-divorce payments and, as of the date of this opinion, the evidence establishes that these payments total $6,701.80. This added to $1,288.53 makes her "invested equity" in the property $7,990.33 compared to O'Neill's equity of $1,288.53—without even considering the tax and other assessments against the property which the evidence further disclosed had been paid by Clina.

Chase Manhattan Bank went on to make two other loans to the parties. On August 20, 1971, more than six months after the divorce, it issued an installment loan to Clina in the amount of $5,612.16 for home improvement purposes. The terms of the loan called for 48 repayments of $117.00 each and Clina proceeded to meet every installment, the final payment being made in August of 1975. Then, in May of 1972, Chase Manhattan Bank made a loan of $2,259.36 to O'Neill to be repaid by monthly deductions of $94.14 from his paychecks. Contrary to his testimony, however, this loan was *not* for home improvement purposes but rather for the purchase of furniture in Puerto Rico.

Apparently borrowed to the limit at Chase Manhattan Bank, Clina turned to Barclays Bank and, on July 10, 1972, received a Discount Loan in the amount of $900.00 for home improvement purposes. She commenced repay-

ment on a regular basis but, finding that the cost of the addition to her home was more than she had initially anticipated, had to re-finance the remaining balance. She did this by taking out a loan for $1,700.00 from Barclays Bank on January 29, 1973, which loan was finally repaid in March of last year.

■ Any action for partition is necessarily a bitter one. It arises when several persons, holding title to real property as tenants in common, have a falling out. Either of the parties may bring an action sounding in equity for the partition of such realty according to their respective rights therein. If it appears that a physical partition cannot be had without great prejudice, the Court may order a sale of part or all of such property. Otherwise, a partition will be decreed. Thus, since everyone "loses" and the "victorious" party only gains a measure of revenge, feelings of ill-will are bound to run high. It goes without saying, therefore, that such acrimony and rancor is particularly present when the parties are former spouses. Such, is the situation here. That is why it would have been more convenient for all concerned had the request for partition been raised in the divorce proceeding itself. That way, the Court would then clearly have seen the inequity of the terms of its decree. Nevertheless, this Court cannot deny to either party the right to become entirely independent of the other. Both should be permitted to realize and enjoy during their lifetimes their respective property values.

Initially, I am confronted with Clina's affirmative defense that, inasmuch as she possesses a life estate in O'Neill's one-half share of the property by virtue of the Final Divorce Decree, the judgment of partition shall not affect said life estate. While her counsel has not supplied any statutory basis for this proposition, it appears to be based upon several alternative provisions of Chapter 21 of Title 28. All, however, will be shown to be inapplicable un-

der the instant circumstances. If Clina is relying upon 28 V.I.C. § 461, her reliance is misplaced for that section is inapposite here. Section 461 merely refers to judgments and partitions under section 460—the provision empowering the District Court to either confirm or set aside the referee's report of the partitioning which it has previously ordered pursuant to 28 V.I.C. §§ 458 and 459. But 28 V.I.C. §§ 458 and 463 also empower the Court to order a sale in lieu of partition if it finds that the property is so situated that a partition cannot be made without prejudice to the parties. As I noted previously, Gladstone Knight reported that it would not be possible to partition the property and, since no one has contested that analysis, I now adopt it as my own. Accordingly, since O'Neill's relief must be by sale and not by partition, Clina cannot rely upon section 461 which speaks exclusively of the partitioning remedy and the protection afforded to tenants for years or for life.

If, on the other hand, Clina is relying upon 28 V.I.C. §§ 479–484 inclusive, then those sections do not constitute an affirmative defense to O'Neill's action but, instead, indicate various factors which must be considered by this Court in determining the appropriate division of the proceeds from the ordered sale.

Section 479 provides:

When the estate of any tenant for life or years . . . has been admitted by the parties . . . such estate may be first set off out of any part of the property, and a sale made of such parcel, subject to the prior unsold estate of such tenant therein; but if in the judgment of the court a due regard to the interest of all the parties requires that such estate be also sold, the sale may be so ordered.

Although a cursory glance at this provision might lend some support to Clina's contention, it is my opinion that a closer reading reveals the true import of this section: namely, to vest in the District Court the discretion to de-

termine whether or not to set off an estate for life or years from the property ordered to be sold. Accordingly, this Court finds that justice cannot be accomplished without including in the sale the life estate in the one half share of the property to be sold.

Sections 480–482 support such a statutory interpretation. A life estate or an estate for years is a valuable property right, the sale of which entitles the tenant to receive compensation therefor. Compensation would be by an equivalent annuity stream or by a lump sum representing the present value thereof. 28 V.I.C. § 480 authorizes the life tenant to consent to such a sum in gross in satisfaction for his or her estate while 28 V.I.C. § 481 dictates the procedure to be followed where consent is not given. Under that section, it is up to the Court to ascertain and determine what proportion of the proceeds of the sale, after deducting expenses, will be a just and reasonable sum.

This property has been appraised as having a present fair market value of $39,560.00. If the parties agree not to sell, then they must accept this appraisal as the net amount that would be realized from a sale. With that agreement and assumption, each party would then be asked whether he or she is or would be able to buy the other's share. So now we must compute the values of their respective shares in this "buy or sell" arrangement.

Since the total value of the property is $39,560.00, this puts the value of each Tenant in Common's share at $19,780.00. In actuality, however, Chase Manhattan Bank has an interest in the property amounting to $10,629.81 which reduces the true value of each Tenant in Common's share to $14,465.10. Moreover, since each party had an equity interest in the property of $1,288.53 at the time of the divorce, that equity interest would now be worth $1,806.36 based upon an "opportunity cost" interest rate of 6% from February 17, 1971 to July 1, 1974 and 9%

thereafter. Accordingly, the "inter-tenant" value of each Tenant in Common's share is more accurately stated at $12,658.74. Were there no other factors involved in this litigation, either party could buy out the other's interest for that amount. However, there are other factors which figure critically in arriving at a "buy or sell" arrangement between the parties.

Clina paid $7,312.16 in improving the total property. Thus, she should be reimbursed by O'Neill for his aliquot share thereof, to wit: $3,656.08. Similarly, since she has also paid $6,701.80 on the purchase money mortgage since the divorce, she is entitled to a reimbursement from O'Neill in the amount of $3,350.90. Summing these two figures together, I arrive at a total reimbursement of $7,006.98. Finally, using the long-accepted rule in the Virgin Islands that a life estate should be valued at roughly one-third (⅓) of the fee—assuming a reasonable longevity period, the value of Clina's life estate in O'Neill's one-half share of the property is $4,219.58. His remainder value is therefore $8,439.16.

Accordingly, if Clina "wished" to purchase O'Neill's interest in the property, she would have to pay him $8,439.16 less the reimbursements to which she is entitled and in addition assume the balance of the mortgage payments. On the other hand, if O'Neill "wished" to purchase Clina's interest in the property, he would have to pay her $12,658.74 for her share, $4,219.58 for her life estate, the reimbursements to which she is entitled, and in addition assume the balance of the mortgage payments.

Based on the foregoing figures, if O'Neill elects to buy Clina's share, he will have to pay her $23,885.30 and start assuming sole the repayment of the home purchase money mortgage commencing with the March, 1976 payment. However, if Clina is the one who buys the other out, she

will have to pay O'Neill $1,432.18 and continue alone the repayment of the aforementioned mortgage.

The decree, under these facts and circumstances, will necessarily be one granting to the parties alternative options, but the most feasible option for all practical purposes, in my opinion, would be the one wherein Clina would "buy out" O'Neill for $1,432.18.

Although this action was O'Neill's law suit, I find that Clina is the "prevailing" party and should be entitled to reimbursement for attorney's fees. Thus, her attorney is hereby instructed to file a Bill of Costs, which will include his time and normal charges for the various legal services rendered in this action.